UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - x

ADAM INGLES et al.,                          :

                    Plaintiffs,              :      **OPINION**

          - against -                        :      01 Civ. 8279 (DC)

ELMER TORO et al.,                           :

                    Defendants.              :

- - - - - - - - - - - - - - - - - - - - - - x

**APPEARANCES:**    (see last page)

**CHIN, D.J.**

          In this prisoners' civil rights case, twenty-two
present and former inmates in the New York City correctional
system allege that they were subjected to a pattern and practice
of excessive force by uniformed employees of the New York City
Department of Correction ("DOC") in violation of the Eighth and
Fourteenth Amendments to the United States Constitution and the
laws and Constitution of the State of New York.  Plaintiffs
sought declaratory and injunctive relief on a class basis as well
as damages for their individual injuries.  Following four years
of hard-fought litigation, including extensive discovery, motion
practice, and settlement negotiations, the parties entered into a
settlement agreement (the "Agreement"), subject to approval by
the Court, resolving the class claims for equitable relief.  The
parties now seek approval of the Agreement, as required by Rule
23(e) of the Federal Rules of Civil Procedure.

          The Court finds that the proposed settlement is fair,
reasonable, and adequate.  Indeed, much good will be

accomplished. The Agreement will result in far-reaching and extensive remedies and initiatives that will address, in a concrete and effective way, the very difficult issue of the use of force in our prisons. To its credit, although it has steadfastly denied any liability or wrongdoing, the City of New York has agreed to these measures, recognizing the importance of continuing its on-going efforts to manage and reduce the use of force by corrections officers. The Agreement is approved.

## BACKGROUND

### A.  Summary of Facts

This is the fifth in a series of federal class actions against the City alleging the use of excessive force in its prisons and detention facilities. The City has been litigating these cases for a quarter of a century. See Sheppard v. Phoenix, 210 F. Supp. 2d 450 (S.D.N.Y. 2002) (Central Punitive Segregation Unit); Jackson v. Montemagno, No. 85 Civ. 2384 (AS) (E.D.N.Y. Nov. 26, 1991) (order approving stipulation for entry of judgment covering Brooklyn House of Detention); Reynolds v. Ward, No. 81 Civ. 101 (PNL) (S.D.N.Y. Oct. 1, 1990) (order and consent judgment covering hospital prison wards); Fisher v. Koehler, 718 F. Supp. 1111 (S.D.N.Y. 1989) (Correctional Institute for Men).

The present case involves institutions operated by DOC on Rikers Island and in Manhattan, Queens, and the Bronx that were not already subject to court orders or consent decrees

obtained in the prior lawsuits. (Compl. ¶ 2). The individual defendants include the uniformed staff, supervisory staff, wardens of the several DOC institutions, and other DOC officials alleged to have been engaged in, or to have acquiesced to, a pattern and practice of excessive force against plaintiffs and other inmates. (Id. ¶¶ 6-18).

Plaintiffs are present and former DOC inmates who allege that they have suffered physical injury while in DOC custody as a result of defendants' use of excessive force.[2] Specifically, plaintiffs allege that they have suffered unjustified beatings at the hands of DOC personnel, as punishment for minor misconduct, verbal complaints, protests, or perceived disrespect. (Id. ¶¶ 2, 20). They allege that DOC personnel routinely falsified documents and fabricated claims of provocation to cover up the assaults. (Id. ¶ 24). Plaintiffs contend that defendants have either ordered, participated in, or acted in complicity with or acquiescence towards this pattern of excessive force. (See, e.g., id. ¶¶ 20-49).

---

[1]     References to "Compl." are to the Fourth Amended Complaint.   The twelve facilities at issue in this case are: the Adolescent Reception and Detention Center, Anna M. Kross Center, George Motchan Detention Center, George R. Vierno Center, Manhattan Detention Complex, North Infirmary Command, Otis Bantum Correctional Center, Rose M. Singer Center, West Facility, Bronx House of Detention, Queens House of Detention, Transportation Division, Emergency Services Unit, and Vernon C. Bain Correctional Facility.   (Compl. ¶ 19).

[2]     For a more detailed discussion of the alleged incidents of excessive force against the class representatives, see Ingles v. City of New York, No. 01 Civ. 8279 (DC), 2003 WL 402565 (S.D.N.Y. Feb. 20, 2003).

- 3 -

Defendants have denied the allegations of wrongdoing. In particular, the City has argued, and provided statistical evidence to show, that the number of reported use of force incidents declined substantially prior to and during the pendency of this lawsuit. (See, e.g., Larkin Decl. ¶ 6 (decline of 33% from 1,463 incidents in 2000 to 974 incidents in 2004). The City maintained throughout the lawsuit that DOC's systems for reporting, investigating, and monitoring the use of force met constitutional and other applicable standards. (Id. ¶ 18).

## B. Prior Proceedings

This case was filed on September 5, 2001, by Adam Ingles pro se. Ingles thereafter obtained counsel. On September 6, 2002, Ingles filed an amended complaint adding twenty-one additional plaintiffs and asserting class allegations. By memorandum decision filed February 20, 2003, I certified the class. Ingles, 2003 WL 402565, at *9. Eventually, plaintiffs filed the Fourth Amended Complaint.

The parties engaged in massive discovery, during which some 400,000 pages of documents were exchanged, numerous expert reports were produced, six site inspections of detention facilities were conducted, and some 140 fact and expert witnesses were deposed. (Larkin Decl. ¶¶ 19-29; see Abady Decl. ¶ 9). Several high-level DOC officials, including the Commissioner, the Deputy Commissioner for Investigations and Trials, the Inspector General, and a former Commissioner were deposed. (Larkin Decl. ¶ 23). There were numerous discovery disputes and the parties

- 4 -

engaged in extensive motion practice, including a bifurcation motion, Daubert motions, in limine motions, and defendants' summary judgment motion. A trial date was set and then adjourned several times as the parties engaged in settlement discussions.

## C.    The Settlement Negotiations

Settlement negotiations began in October 2002, but little progress was made at first. (Abady Decl. ¶ 13). In November 2003, I referred the case to Magistrate Judge Debra C. Freeman to supervise settlement negotiations, and she was enormously helpful as she held several full-day settlement sessions with the parties. (Id.; Larkin Decl. ¶ 36). The parties were unable to agree on many significant issues, however, including, as discussed more fully below, whether any settlement would take the form of a consent decree or a private settlement agreement.

In mid-2005, I offered to participate in the settlement discussions in an effort to help the parties resolve their disagreements. Both sides welcomed my involvement. The parties executed a stipulation agreeing that my participation in settlement discussions would not be a basis for any objection to my presiding over the rest of the case, including the trial, and agreeing further that no party would seek my recusal based on my involvement in the settlement process. (Abady Decl. ¶ 14; Larkin Decl. ¶¶ 40-41 & Ex. 7).

Beginning in June 2005 and continuing through February 2006, the parties engaged in extensive discussions, as they

- 5 -

continued to litigate the case and prepare for trial.  I
conducted no less than eighteen settlement conferences, meeting
with the two sides both together and separately, sometimes for
several hours at a time.  Of course, the parties met many more
times on their own, for a while on a weekly basis and in the end
almost on a daily basis.  (Abady Decl. ¶ 14; Larkin Decl. ¶¶ 41-
43).  DOC's General Counsel, Florence Hutner, attended many of
the settlement conferences and played an instrumental role.  The
Commissioner, Martin F. Horn, personally attended one of the
settlement conferences with the Court.

## D.    **The Settlement**

In mid-February 2006, with trial scheduled to start in
just a few weeks, the parties finally reached agreement on all
terms and language.  The Agreement was signed on February 17,
2006.  (Larkin Decl. ¶ 44 & Ex. 1; Abady Decl. ¶ 10).

The Agreement calls for a number of important measures
covering DOC's use of force policy, investigations, training, and
monitoring and tracking, including the following:

●    The City will install wall-mounted recording
cameras in numerous agreed-upon locations.  (Agreement ¶¶ 14-16).
The cameras will employ a recording capability sufficient to
produce smooth action footage with an image quality sufficient to
permit the identification of persons captured in the recordings.
(Id. ¶ 10).  The locations were selected with the consent of
plaintiffs' counsel, who sought the placement of cameras in areas
where they contend there have been higher numbers of use of force

- 6 -

incidents. The locations are set forth in a sealed exhibit to the Agreement, and the precise locations are being kept confidential. DOC's agreement to install these cameras is significant, as the City will be expending what undoubtedly will be millions of dollars to purchase and install new cameras and upgrade or replace existing ones. Plaintiffs' attorneys believe, based on the results in other facilities that were the subject of prior litigation, that "these cameras will be effective in deterring staff misconduct in these locations." (Abady Decl. ¶ 18).

●     DOC will continue to require its Emergency Services Unit (the "ESU") to carry hand-held cameras when conducting searches and to record searches and any related uses of force. (Agreement ¶ 18). This was a practice that began as a result of a command-level order during the pendency of this lawsuit. (Abady Decl. ¶ 20). It was plaintiffs' contention that ESU searches often resulted in the use of force, and this requirement will ensure that a hand-held camera will be available to capture incidents when the ESU is called into action.

●     DOC will issue a revised use of force directive. The revised directive will more clearly state that corrections officers may not "use more force than is necessary" and that "[f]orce may not be used to punish an inmate." (Agreement ¶ 19(b)). The revised directive will more clearly instruct staff to "start with the minimum amount of force needed," advising that staff may "escalate the amount of force used only if the

- 7 -

situation requires escalation."  (Id. ¶ 19(c)).  The revised directive strives to maintain operational flexibility and explicitly recognizes that "there are occasions when the use of force is necessary," but it will help provide important clarification.  (Id. ¶ 19(b)).  The use of force directive must be followed by DOC personnel and will be enforced, like all DOC directives, through the DOC disciplinary process.  (Id. ¶ 19; see Abady Decl. ¶ 24).

•       The City will make certain changes to its training of corrections officers in the use of force, at the initial recruit stage and during in-service training.  Attendees will be required to demonstrate that they can perform proper defensive techniques.  In addition, at least once a month, roll-call training will include review and reinforcement of the use of force policy.  (Agreement ¶¶ 38-40).

•       In the area of investigations, DOC will create a new Investigation Division Manual, with the assistance of an outside consultant, that will address use of force investigations; DOC will adopt a forty-hour training program for new investigators as well as an annual fourteen-hour program; new criteria have been set for the opening of investigations of use of force incidents; and DOC has agreed to maintain no more than an eight-month average for the completion of investigations, to reduce the delays that plaintiffs' counsel maintains have marked these investigations in the past.  (Id. ¶¶ 22-32).

• Unless circumstances do not permit, DOC staff will take, from no more than four feet away, "clear" photographs of inmates immediately following use of force incidents. (Id. ¶ 35). DOC staff will also use a form that includes a diagram of the human body so that the locations of all injuries can be noted and the injuries described. (Id. ¶ 33).

• DOC will create a system for tracking officer use of force. The system will track, among other things, the injuries sustained (by inmates and officers); the location of the incident; whether a video recording was made; and whether disciplinary charges were recommended and filed and, if so, the outcome thereof. (Id. ¶ 41).

• DOC will provide plaintiffs' counsel with certain additional documents, for the term of the Agreement, and will permit plaintiffs' counsel to tour facilities to observe the placement and operation of cameras until all cameras required by the Agreement are installed. (Id. ¶¶ 16, 45-46).

The Agreement will remain in effect until November 1, 2009 (id. ¶ 52), just before the end of Mayor Bloomberg's second term. (Def. Mem. at 2). The Agreement provides for a release of the City and other defendants by the class from any claims for class-wide declaratory, injunctive, or other equitable relief from the signing of the Agreement through its expiration. (Agreement ¶¶ 59-60).

The Agreement is a private settlement agreement and, under the terms of the Prison Litigation Reform Act of 1995 (the

- 9 -

"PLRA"), 18 U.S.C. § 3626(c)(2), it is not an enforceable court order or consent decree. (See Abady Decl. ¶ 42). This was an important issue for the City, as it lists it first among the benefits of the Agreement to the City:

> The terms of the Agreement are beneficial to the City for a number of reasons. First, it takes the form of a private settlement agreement, not a consent decree, and for this reason the Court will not retain jurisdiction in order to oversee compliance with its terms. Rather, the Commissioner retains full authority and discretion to manage the agency in accordance with the City Charter.

(Larkin Decl. ¶ 5).

If plaintiffs believe the City has breached the Agreement, after exhausting a dispute resolution mechanism, they may seek judicial relief only by (1) commencing an action for breach of contract in state court or (2) moving to reinstate this action in this Court. (Agreement ¶ 48). In other words, plaintiffs cannot return to this Court to seek an order compelling compliance if they believe there is a breach; they may return to this Court only to reinstate the action to proceed to trial. (See Abady Decl. ¶ 42). In fact, the Agreement specifically provides that upon dismissal of the case, "this Court shall not retain jurisdiction except in the event that Class Counsel seeks and the Court grants reinstatement of the Action." (Agreement ¶ 5).

The Agreement provides for the City to pay to Sullivan & Cromwell LLP ("Sullivan & Cromwell") $700,000 as reimbursement for its costs and disbursements, and $750,000 to Emery Celli

- 10 -

Brinckerhoff & Abady LLP ("Emery Celli") for a portion of its fees, costs, and disbursements. (Agreement ¶ 51). All other fees and costs are waived, as the Legal Aid Society waived all of its fees and costs and Sullivan & Cromwell waived all of its fees. For both, the amounts were in the millions of dollars. Emery Celli waived a substantial part of its fees and costs as well. (Abady Decl. ¶ 76).[3]

## E. Notice to the Class and the Fairness Hearing

A fairness hearing was set for March 31, 2006, and the Court signed an order requiring the City to give notice to the class by posting notice of (1) the terms of the proposed settlement, (2) the procedures for commenting and objecting, and (3) the date and time of the fairness hearing. (Larkin Decl. ¶ 58 & Ex. 8; Abady Decl. ¶ 51). The City complied with the Court's order by posting notices, in English and Spanish, in all housing areas affected by the Agreement and by distributing the notice on consecutive Sundays in areas where inmates were in segregation. (Conry Decl. ¶¶ 3-5 & Exs. 1-4).

---

[3]     These fees and costs do not include fees and costs incurred with respect to the individual damages claims, which were governed by individual retainer agreements. By a separate stipulation also signed on February 17, 2006, the parties settled the named plaintiffs' individual claims for damages. (Larkin Decl. ¶ 60). The negotiations as to these claims were also difficult and extended, and the City took the position that it would not settle the class claims unless all the individual claims were settled as well. The individual settlements ranged from $15,000 to $575,000 and totaled $2,213.000, inclusive of fees and costs (which were waived for some of the named plaintiffs). Significantly, certain corrections officer defendants agreed to pay certain sums to the City as contribution.

The fairness hearing was held on March 31, 2006, as scheduled. No objections were received before the hearing, and no objections were submitted or made at the hearing. A population of approximately 13,500 inmates received notice of the proposed settlement. (Abady Decl. ¶ 52).

## DISCUSSION

### A. Applicable Law

Under Rule 23(e) of the Federal Rules of Civil Procedure, a settlement of a class action requires approval of the court. Fed. R. Civ. P. 23(e)(1)(A). The court may approve a settlement that is binding on the class only if it determines that the settlement is "fair, adequate, and reasonable" and not a "product of collusion." Joel A. v. Giuliani, 218 F.3d 132, 138 (2d Cir. 2000); see Fed. R. Civ. P. 23(e)(1)(C). This evaluation requires the court to consider both "the settlement's terms and the negotiating process leading to settlement." Wal-Mart Stores, Inc. v. Visa U.S.A. Inc., 396 F.3d 96, 116 (2d Cir.) (citation omitted), cert. denied, 125 S. Ct. 2277 (2005). "A 'presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery.'" Id. (quoting Manual for Complex Litigation, Third § 30.42 (1995)).

Rule 23(e) does not set forth the factors a court is to consider in determining whether an agreement is fair, reasonable, and adequate. In this circuit, courts traditionally have considered the following factors, commonly referred to as the

Grinnell factors: (1) the complexity, expense, and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining a class action through trial; (7) the ability of defendants to withstand greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund in light of the attendant risks of litigation. City of Detroit v. Grinnell Corp., 495 F.2d 448, 463 (2d Cir. 1974), abrogated on other grounds, Goldberger v. Integrated Res., Inc., 209 F.3d 43 (2d Cir. 2000); see also Wal-Mart Stores, 396 F.3d at 117-19 (applying Grinnell factors to determine that settlement agreement was fair).

In cases where the plaintiffs seek declaratory and injunctive relief rather than money damages, there is no need to examine the last three Grinnell factors. E.g., Mirasol A. v. Giuliani, 185 F.R.D. 152, 162 (S.D.N.Y. 1999) ("The court will not review the last three [Grinnell] criteria as they are applicable only in actions for damages, and will examine the fifth criteria in light of establishing remedies instead of damages."). The weight given to any particular factor will vary based on the facts and circumstances of the case. Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, 7B Federal Practice and Procedure: Civil § 1797.1, at 77 (3d ed. 2005).

Public policy, of course, favors settlement. Wal-Mart, 396 F.3d at 116-17; accord Williams v. First Nat'l Bank, 216 U.S. 582, 595 (1910) ("Compromises of disputed claims are favored by the courts."); TBK Partners, Ltd. v. W. Union Corp., 675 F.2d 456, 461 (2d Cir. 1982) (noting "the paramount policy of encouraging settlements"). Consequently, when evaluating a settlement agreement, the court is not to substitute its judgment for that of the parties, nor is it to turn consideration of the adequacy of the settlement "into a trial or a rehearsal of the trial." Grinnell Corp., 495 F.2d at 462. "Rather, the Court's responsibility is to reach an intelligent and objective opinion of the probabilities of ultimate success should the claim[s] be litigated and to form an educated estimate of the complexity, expense and likely duration of such litigation and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise." In re Met. Life Derivative Litig., 935 F. Supp. 286, 292 (S.D.N.Y. 1996) (quoting Lewis v. Newman, 59 F.R.D. 525, 527-28 (S.D.N.Y. 1973)) (internal quotation marks and ellipses omitted).

## B.  Application

I consider the "settlement's terms' and the "negotiating process" in the context of discussing the first six Grinnell factors. In addition, I discuss one aspect of the Agreement I find to be troubling.

- 14 -

## 1. The Grinnell Factors

### a. Length, Complexity, and Duration of Litigation

The claims in this case presented difficult and complex legal and factual questions. The parties had compiled a massive body of evidence and plaintiffs had estimated that the case would take four months to try. I told the parties I would allow two months. Plaintiffs wanted to offer evidence of the twenty-two incidents involving the named plaintiffs as well as of an additional thirty-five (or more) incidents involving other inmates who were allegedly beaten. (Abady Decl. ¶ 46).

The fourth amended complaint also named fifty-eight corrections officers and seventeen captains as defendants, both individually and in their official capacities. (Compl. ¶¶ 6, 7). Each of these defendants had the right to present a defense and participate in the trial. Plaintiffs' Monell claims would have required testimony from high-level DOC officials, including the Commissioner and his predecessor. (Def. Mem. at 8). The parties had also designated a dozen expert witnesses, including four corrections experts (two per side) and eight medical experts. (Abady Decl. ¶ 47).

Accordingly, a trial would have undoubtedly required a hundred or more witnesses. (Def. Mem. at 8). See Wal-Mart, 396 F.3d at 118 (likelihood of three-month trial involving complex antitrust claims favored settlement); Marisol A., 185 F.R.D. at

162-63 (likelihood of five-month trial involving more than one hundred fact witnesses and twelve experts favored settlement).

Complicating matters was the fact that the trial would have involved both damages claims tried to a jury as well as equitable claims tried to the Court. Issues would have arisen as to what evidence would be presented to the jury and what evidence would be presented only to the Court. With twenty-two plaintiffs and more than seventy-five defendants, logistical questions would have arisen as to how many of these individuals would be present in the Courtroom and when.

A trial would have required a jury (or different juries) to render verdicts on twenty-two damages claims. On the claims for equitable relief, the Court would have been required to render extensive findings of fact and conclusions of laws.

Moreover, no matter what the outcome, the losing side would have undoubtedly appealed, further extending the duration of the case. With more than four years of class action litigation behind us already, the case surely would have been litigated for many more years to come if it had not been settled.

The complexity, expense, and likely duration of a trial and further litigation weigh heavily in favor of approval of the Agreement.

## b.    **Reaction of Class**

As anyone familiar with prisoner civil rights litigation knows, prisoners are not shy about voicing grievances.

- 16 -

Here, not a single objection to the Agreement has been received. This factor also strongly weighs in favor of approval.

### c.  Stage of Proceedings and Amount of Discovery

The case had reached a point where discovery had been completed, Daubert, in limine, and summary judgment motions had been filed, and a trial date had been set. Both the Court and the parties had a substantial evidentiary basis for evaluating the strengths and weaknesses of plaintiffs' claims and defendants' defenses.

The extensive discovery included the exchange of some 400,000 pages of documents and the taking of some 140 depositions. The litigation was hard-fought and the settlement negotiations, as discussed above, were extended and involved the Court. See Wal-Mart, 396 F.3d at 117 (noting that district court held that "there could not be any better evidence of procedural integrity than the aggressive litigation spanning nearly a decade and the impassioned settlement negotiations that produced an agreement on the brink of trial").

There was no collusion. To the contrary, the litigation was passionately contested, and the Agreement was the result of extensive arm's-length negotiations between experienced, capable counsel after meaningful discovery.

The lawyers for both sides are to be highly commended. The plaintiff class was represented by a powerful combination of a public interest organization, a small plaintiffs' civil rights firm, and a large corporate New York City law firm. The

Prisoners' Rights Project of the Legal Aid Society, led by
Jonathan S. Chasan and Mary Lynne Werlwas, drew on its extensive
experience in excessive force class actions against the City.
Emery Celli, and in particular Jonathan S. Abady, Andrew G.
Celli, Jr., and Ilann M. Maazel, specialists in civil rights
litigation, provided spirited and highly effective
representation. And in the best pro bono publico tradition of
the New York City law firms, Sullivan & Cromwell, and in
particular Penny Shane and Caroline M. Flintoft, provided
extraordinary lawyering and support.

The City was equally well-represented by the Office of
Michael A. Cardozo, Corporation Counsel of the City of New York.
In particular, Heidi Grossman and Arthur G. Larkin provided the
City with a fiery and fearsome defense, while always proceeding
with the best interests of the public in mind. In addition, as
noted above, Florence Hutner, the General Counsel of DOC, played
a critical role in the settlement discussions.

With these dedicated advocates involved, I have no
doubt that both sides were represented zealously and effectively
and I have no hesitation as to the procedural integrity of the
settlement process. This factor strongly favors approval.

### d. Risks of Establishing Liability

While plaintiffs had amassed a substantial body of
evidence to prove their claims, establishing liability was by no
means certain. Indeed, my own experience is that prisoners have
not fared well at trial. See, e.q., Morris v. Eversley, No. 00

Civ. 8166 (DC), 2004 WL 171337 (S.D.N.Y. Jan. 29, 2004) (jury awarded female prisoner who was victim of sexual assault by corrections officer only $500 in compensatory damages and $7,500 in punitive damages); Ruffin v. Fuller, 125 F. Supp. 2d 105 (S.D.N.Y. 2000) (ordering new trial sua sponte in case where prisoner was subjected to excessive force by corrections officers, including being kicked in mouth, where jury's finding of no liability was against weight of evidence). In addition, the City would have offered a vigorous defense, which would have included statistical evidence to show that the number of use of force incidents has declined substantially in recent years. (See Def. Mem. at 12-13). Every trial comes with risks, but as discussed above, here many particularly complex, difficult factual and legal issues were presented. Finally, the City's Daubert, in limine, and summary judgment motions still had not been decided on the merits when the Agreement was reached, and rulings on these motions surely could have had a significant impact on plaintiffs' ability to prove liability.

This factor also supports approval of the Agreement.

### e.    **Risks of Obtaining Relief**

Even assuming plaintiffs were to establish liability at trial, substantial risks would have existed as to the scope of any relief. Even assuming plaintiffs could show the use of excessive force in a number of individual incidents, they would still have had the challenge of proving that substantial, class-wide relief was warranted. Moreover, with the PLRA, Congress has

- 19 -

imposed significant limitations on the ability of courts to

fashion injunctive relief in prison cases. Indeed, the PLRA

provides:

> Prospective relief in any civil action with
> respect to prison conditions shall extend no
> further than necessary to correct the
> violation of the Federal right of a
> particular plaintiff or plaintiffs.  The
> court shall not grant or approve any
> prospective relief unless the court finds
> that such relief is narrowly drawn, extends
> no further than necessary to correct the
> violation of the Federal right, and is the
> least intrusive means necessary to correct
> the violation of the Federal right.

18 U.S.C. § 3626(a)(1).

The City submits that the steps it will undertake

"voluntarily" as a result of the Agreement "are more

comprehensive than any relief the Court would award after trial."

(Def. Mem. at 17).  This may very well be true.  The City has

agreed to specific, concrete, and meaningful measures that will

require, inter alia, the expenditure of millions of dollars, the

changing of the use of force directive, and the creation of a new

investigations manual, training programs, and tracking

procedures.  It is difficult to imagine that the Court would have

imposed, following trial, significantly more extensive and

detailed relief.

Finally, it is important that the implementation of

these measures will begin immediately.  Even if plaintiffs were

to prevail on liability at trial, the process of litigating the

scope of relief and the details thereof surely would have taken
months.

Accordingly, this factor also favors approval of the
Agreement.

### f. Risks of De-Certification

Finally, there was certainly some risk that the case
would not have been maintained as a class action through trial.
The City had sought de-certification on the grounds that none of
the class representatives had standing to seek injunctive relief.
(Def. Mem. at 18). The motion was argued but not decided on the
merits when the Court denied it in light of the settlement
discussions, without prejudice to reinstatement if the case did
not settle. Defendants surely would have reinstated the motion
if the case did not settle. This is a factor in support of
approval as well.

### 2. The PLRA

I am troubled by one aspect of the proposed settlement
-- the requirement that any claim of a breach of the Agreement
may be addressed only by bringing a new lawsuit for breach of
contract in state court or by reinstating this action. In other
words, plaintiffs may not return to this Court to seek compliance
with the Agreement; they may return only to reinstate the action
and to try the case.

This provision of the Agreement has its roots in the
PLRA. As noted above, § 3626(a)(1) provides that the court may
not grant or approve "any prospective relief" unless it finds

- 21 -

that such relief is "narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1) (emphasis added). The underscored language seems to require a finding or an admission of a violation of a federal right.

In § 3626(c), the PLRA provides for two kinds of settlements: "consent decrees" and "private settlement agreements." The PLRA prohibits a court from entering or approving a "consent decree" unless it complies with "the limitations on relief" set forth in § 3626(a). 18 U.S.C. § 3626(c)(1). On the other hand, "private settlement agreements" need not comply with those limitations, as long as they "are not subject to court enforcement other than the reinstatement of the civil proceeding that the agreement settled." Id. § 3626(c)(2)(A); see also id. § 3626(g)(6) ("the term 'private settlement agreement' means an agreement entered into among the parties that is not subject to judicial enforcement other than the reinstatement of the civil proceeding that the agreement settled"). Plaintiffs may seek relief for breach of a private settlement agreement by suing "in State Court" for "any remedy available under State law." Id. § 3626(c)(2)(B). Finally, the PLRA defines the word "relief" to mean "all relief in any form that may be granted or approved by the court, and includes consent decrees but does not include private settlement agreements." Id. § 3626(g)(9).

These provisions leave parties in prisoners' class actions who are seeking to settle in a predicament. On the one hand, the PLRA seems to provide that a court cannot approve a consent decree unless there is a finding of a violation of a federal civil right. Few defendants, particularly governmental defendants, will be willing to admit to any wrongdoing as part of a negotiated settlement. Cf. Inmates of Suffolk Co. Jail v. Rouse, 129 F.3d 649, 655 (1st Cir. 1997) (holding that Congress intended the PLRA as "a last rite" for many consent decrees). Of course, defendants enter into settlements in part to avoid a finding of wrongdoing. Accordingly, most defendants under the PLRA will insist that any settlement take the form of a "private settlement agreement," which does not require a finding of a violation.

On the other hand, plaintiffs (and experienced class counsel) will be reluctant to enter into a "private settlement agreement" because the PLRA limits the means by which they may enforce such an agreement to seeking relief in state court under state law. Plaintiffs may return to federal court only to seek reinstatement of the action -- in essence, to rescind the agreement and to proceed to trial.

Here, plaintiffs (and their highly experienced counsel) agreed to the "private settlement agreement' format. This decision was certainly reasonable and understandable, in view of the risks and burdens of proceeding to trial and the significant and wide-ranging relief obtained as a result of the Agreement.

But it makes little sense that, if a perceived problem with compliance should arise, short of seeking reinstatement of this action, plaintiffs can seek relief only in state court under state law. In view of the time and effort I have spent on this case, including countless hours discussing not only the substantive terms of the Agreement but also its language, it would be a tremendous waste of resources for the parties to have to go to state court to seek relief from a state court judge wholly unfamiliar with the case.

Nonetheless, in view of all the other considerations discussed above, I conclude that the Agreement is fair, adequate, and reasonable.

### CONCLUSION

The Agreement is hereby approved. The Court will issue today the final Order of Dismissal with Prejudice.

SO ORDERED.

Dated:    New York, New York
          April 3, 2006

                                        DENNY CHIN
                                        United States District Judge

Class Counsel for Plaintiffs:

    THE LEGAL AID SOCIETY
    Prisoners' Rights Project
        By:  Jonathan S. Chasan, Esq.
              Mary Lynne Werlwas, Esq.
              Betsy Ginsberg, Esq.
              John Boston, Esq.
    199 Water Street, 6th Floor
    New York, NY  11201

    EMERY CELLI BRINCKERHOFF & ABADY LLP
        By:  Jonathan S. Abady, Esq.
              Andrew G. Celli, Jr., Esq.
              Ilann M. Maazel, Esq.
              Sarah Netburn, Esq.
              Katherine Rosenfeld, Esq.
    545 Madison Avenue, 3rd Floor
    New York, NY  10022

    SULLIVAN & CROMWELL LLP
        By:  Penny Shane, Esq.
               Caroline M. Flintoft, Esq.
              Claire E. Coleman, Esq.
              Sara L. Manaugh, Esq.
    125 Broad Street
    New York, NY  10004

Counsel for City Defendants:

    MICHAEL A. CARDOZO, ESQ.
    Corporation Counsel of
     the City of New York
        By:  Heidi Grossman, Esq.
              Arthur G. Larkin, Esq.
    100 Church Street
    New York, NY  10007